UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| NORTH AMERICAN SPECIALTY INSURANCE CO., | ) ) ) |
| Plaintiff, | ) Action No. 5:08-CV-486-JMH ) |
| v. | ) ) **MEMORANDUM OPINION AND ORDER** |
| JOHN PAUL PUCEK, et al., | ) ) |
| Defendant. | ) ) ) |

\*\*   \*\*   \*\*   \*\*   \*\*

This matter is before the Court on motion of Plaintiff North American Specialty Insurance Company ("NAS") for Summary Judgment [Record No. 123, 129[1]]. Defendants responded [Record No. 130] and NAS then filed a Reply [Record No. 135]. This matter is now ripe for review.[2]

This case arises from a dispute regarding coverage under an equine mortality insurance policy (the "Policy") issued by NAS for a racing thoroughbred, Off Duty, owned by

---

[1] Plaintiff received leave to file an Amended Memorandum so the format of the factual allegations would comply with the Court's February 23, 2011 Order. [Record No. 128].

[2] Defendants' claims of breach of contract and extra-contractual theories of relief are pending in Fayette Circuit Court, following remand by this Court. [Record No. 29]. Plaintiff's declaratory judgment action regarding coverage under the equine insurance policy is the only matter pending before this Court.

1

Defendants John Paul Pucek, David Fogg, Brett Setzer, and Robert L. Edwards (collectively "Owners" or "Defendants"). Off Duty was injured during training and destroyed several days following the injury. The Policy does not cover death caused by intentional destruction except under very specific circumstances. NAS first argues that Defendants are not entitled to payment under the Policy because the Owners failed to provide treatment as required under the Policy. Second, NAS argues that Off Duty did not meet the requirements for humane destruction, an exception to the intentional destruction exclusion in the Policy, and, therefore, Off Duty's death is not covered. Defendants argue that their actions met the "proper care" standard under the Policy and that Off Duty's condition qualified his death for inclusion under the stated coverage in the Policy.[3] In the alternative, Defendants argue that there

---

[3] Additionally, Defendants argue that the direct financial interest of Ron Kirk, the principal of Kirk Horse Insurance and the Managing Underwriter, impacts coverage herein. It does not. Defendants are currently pursuing claims of breach of contract and extra-contractual theories of relief in Fayette Circuit Court, following remand by this Court. [Record No. 29]. Defendants fought federal jurisdiction over those case theories near the inception of this litigation and may not have a second opportunity to litigate those claims here when they have elected the state court as a forum. As discussed thoroughly by this Court in prior Orders [Record No. 28, 29, 69, 72], the instant dispute is one of contract interpretation only. The Defendants' argument regarding the propriety of Ron Kirk's

are genuine issues of material fact preventing summary judgment in this matter.

**Background**

On Sunday, October 19, 2008, Off Duty sustained an injury to his suspensory apparatus at Churchill Downs in Louisville, Kentucky, during training. After being examined by the track veterinarian, who advised the Owners that Off Duty could be humanely euthanized at the track, the Owners requested a second opinion, and arranged for Off Duty to be transported to Rood & Riddle Veterinarian Hospital in Lexington, Kentucky.

Kirk Horse Insurance, LLC ("KHI"), the Managing Underwriter for NAS, was first notified of the injury at approximately 10:00 a.m. by the Owners' insurance agent, Alex Neuman. The horse was examined by Lawrence Bramlage, D.V.M., at Rood & Riddle, who then spoke with Ron Kirk and Ryan Quinn of KHI on Sunday afternoon about Off Duty's injury and condition. Dr. Bramlage believed that Off Duty was a "good candidate" for fetlock arthrodesis surgery, a procedure that Dr. Bramlage developed for this particular

---

involvement is all part of Defendants claims' pending before the state court. Defendants make no counterclaims seeking a direct remedy, not even including a prayer for relief in the amended answer or answer. Thus, this argument is irrelevant to the issue before the Court and will be excluded from consideration.

3

injury. Off Duty did not present any contraindications for surgery. While Off Duty's career as a racehorse was over, he could be used as a breeding stallion and would be able to ambulate without pain if the surgery was successful.

At the time that Dr. Bramlage examined him, Off Duty was "comfortable walking around" with a splint in his stall and "didn't have any evidence of laminitis." As several vets testified, without surgery, the leg opposite of the injured limb eventually becomes overloaded with the additional weight the horse, resulting in the development of a condition known as laminitis. Without surgery, laminitis would be the cause of Off Duty's eventual discomfort and pain, rather than the actual injury. Nearly all horses suffering from laminitis are euthanized.

NAS was first notified of the injury on Monday morning, October 20th. NAS discussed the situation with KHI and determined that under the Policy KHI needed to appoint a veterinarian and who could offer an opinion regarding whether Off Duty met certain specific criteria detailed in the mortality policy, specifically whether Off Duty's injury was incurable and whether Off Duty was in constant pain.

Thereafter, Mr. Quinn contacted Dr. Bramlage's office to see if he could offer a written opinion. Dr. Bramlage

4

said that he had already been asked by the Owners of Off Duty to provide an opinion and that they had indicated that did not want Off Duty to receive the surgery. Dr. Bramlage also explained that, although Off Duty was a good candidate for surgery, he could not in good conscience perform or recommend surgery if the Owners were not in favor of doing the surgery and might hope that the surgery will fail.

Ultimately, Dr. Bramlage provided a written opinion to the Owners, which was then forwarded to NAS, stating that the injury was catastrophic and that, according to the AAEP (American Association of Equine Practitioners) Guidelines, it would be grounds for humane destruction because the injury is chronic and incurable in the current state of veterinary medicine. He further stated that fetlock arthrodesis was available for Off Duty, although he noted that the AAEP Insurance Committee held that it was beyond what should be required of the insurer unless all parties agreed to proceed. Dr. Bramlage stated that he had success with numerous horses with this procedure but that he would not perform the surgery unless all parties were in agreement. He suggested contacting Robert Hunt, D.V.M., or Michael Spirito, D.V.M., at Hagyard Equine Medical Institute for an opinion and to have the surgery done, if that was required.

5

As Dr. Bramlage indicated that surgery was an option, although he was not comfortable performing it, and had not stated that Off Duty was incurable or in constant pain, Mr. Quinn continued to look for a veterinarian. Because Dr. Hunt was not available, Mr. Quinn spoke with Dr. Spirito. Dr. Spirito had previously been contacted by one of the Owners, who asked him to provide a counter-opinion to that provided by Dr. Bramlage. Upon receipt of Dr. Spirito's opinion, Mr. Fogg forwarded the written opinion to another Owner, John Paul Pucek, with a note stating "[Dr. Spirito] says it is the best he can do."

In his written opinion, dated October 21, 2008, Dr. Spirito stated that Off Duty's injury was "invariably catastrophic" and that horses with this injury are "chronically and incurably lame to a greater or lesser extent." Like Dr. Bramlage, Dr. Spirito's written opinion stated that Off Duty's injury met the AAEP guidelines for euthanasia.

Dr. Spirito also testified in this matter that Off Duty's condition "was not incurable because there are some horses that survive the procedure," referring to fetlock arthrodesis. He also agreed with Dr. Bramlage's conclusion that "if surgery wasn't performed on Off Duty, he would have eventually developed constant pain but explained that

6

the constant pain was not from the fetlock but from laminitis." Furthermore, a successful fetlock arthrodesis would have resulted in Off Duty, while unable to race, being rendered pain-free, capable of breeding, and pasture sound.

Dr. Spirito was personal friends with Mr. Kirk and with Mr. Fogg, and ultimately asked not to be involved in the matter due to those friendships.

Once Dr. Spirito asked to be removed from the case, Mr. Kirk called Dr. Hunt - who had also been recommended by Dr. Bramlage - to provide an opinion.  Before Dr. Hunt could examine Off Duty, on October 22, 2008 at 2 p.m., KHI received a letter from the Owners' legal counsel advising that the Owners planned to euthanize Off Duty within 24 hours.  Because Dr. Hunt was not available that evening to examine Off Duty, Dr. Hunt's partner, Dr. Richard Holder examined the horse on his behalf to provide a summary of Off Duty's overall condition at that time.  Dr. Holder found Off Duty to be standing quietly in his stall wearing a splint on his left foreleg.  His heart rate and breathing rate were within a normal range.  Although walking with a significant limp, he did bear weight on the injured leg. The records kept on Off Duty indicated that he was eating

7

well, "passing manure normally," and did not "appear very stressful."

At 1:30 p.m. on October 23, 2008, the Owners' counsel advised that one of the Owners felt the horse was suffering during his visit earlier that day and again stated that the Owners' intention was to destroy the horse.

At 2:35 p.m. on October 23, 2008, Dr. Hunt's written opinion was forwarded to the Owners by KHI. Dr. Hunt's opinion stated that Off Duty's injuries were life-threatening if not addressed and acknowledged that the injury has a 90% mortality rate if untreated. The surgical solution for the injury was considered a "salvage procedure with a concession toward the long-term survivability of the patient." In other words, although the surgery and procedure would not have made the horse "normal" or allow the horse to return to racing, it would have allowed Off Duty to have a breeding career. In general, there is a 50 to 70% long-term survival rate when surgery is employed. Dr. Hunt noted that the horse was "reasonably comfortable," bearing weight on the injured limb, and his "vital parameters [were] normal." Thus, the horse "[was] not in immediate life-threatening crisis mandating immediate destruction based on inhumane suffering." Ultimately, Dr. Hunt recommended an attempt at surgical repair, noting that

8

if any complications were encountered he would immediately request humane destruction due to the likelihood of chronic and incurable suffering for Off Duty in the long-term.

To insure that Off Duty had not started experiencing pain since Dr. Holder's examination the day before, Dr. James Smith, another one of Dr. Hunt's partners, examined Off Duty at approximately 2:50 p.m. on October 23, 2008. Dr. Smith confirmed that Off Duty's vital signs were within normal range and was advised by the attending technician that his condition had not changed from the previous day.

On the afternoon of October 23, NAS offered to pay for the surgery, postoperative care and boarding at a facility of its choosing until Off Duty recovered from the surgery, without diminishing the amount of coverage under the Policy in the event the surgery was not successful. The Owners rejected that proposal. Off Duty was intentionally destroyed the next morning at the direction of the Owners. By letter dated November 6, 2008, the Owners submitted a formal claim for payment under the Policy, which was denied on November 24, 2008. This suit followed.

**Standard of Law**

The standard for summary judgment mirrors the standard for directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). A grant of summary judgment is proper

9

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 249; *Summers v. Leis,* 368 F.3d 881, 885 (6th Cir. 2004). The judge's function is not to weigh the evidence, but to decide whether there are genuine issues for trial. *Anderson,* 477 U.S. at 249; *Multimedia 2000, Inc. v. Attard,* 374 F.3d 377, 380 (6th Cir. 2004).

### **Analysis**

In general, the Policy at issue provides coverage for death, theft, and wobbler syndrome for the covered horses, subject to the various conditions and exclusions described therein. The parties' dispute lies in the interpretation and application of the Policy terms, which is a question of law. *Nationwide Mut. Fire Ins. Co. v. Creech*, 431 F.Supp. 2d 710 (E.D.Ky. 2006). The general rule is that ambiguities in insurance contracts should be construed in favor of the insured. *Davis v. American States Ins. Co.,*

562 S.W.2d 653, 655 (Ky.App. 1977). In the absence of ambiguities, the terms of a policy of insurance are to be enforced as written. *Creech*, 431 F.Supp. 2d at 717. "However, where there is no ambiguity, the role of liberal construction in favor of the insured is inapplicable . . . courts cannot enlarge coverage or make new contracts under the guise of construction, but must determine the parties' responsibilities according to the contract terms." *Kentucky Ass'n of Counties v. McClendon,* 157 S.W.3d 626, 633 (Ky. 2005).

The loss, in this case the death of the horse, resulted from the intentional destruction of Off Duty by the Owners following an injury, which implicates two separate provisions of the Policy. First, since Off Duty suffered an injury, the Owners had to comply with the notice and treatment provisions in the Conditions section of the Policy. The Policy provides that:

> Failure or refusal by [the Owners] to comply with these duties will give [NAS] the right to deny coverage if loss occurs as a result of such injury, sickness or disease, whether [the Owners] have personal knowledge of such events or such knowledge is confined to [the Owners'] representatives or others having care, custody or control.
> 
> SECTION IV - CONDITIONS, Subsection 1(u).
> 
> Your duties If Injury, Sickness or Disease Occurs

11

> In case of injury, sickness or disease to the horse, you must:
>
> (1) Give immediate notice to our Managing Underwriter as shown on the Declarations Page;
> (2) Employ at your expense a veterinarian to treat the horse;
> (3) Secure proper care, and, if necessary, allow the horse to be removed at our direction for treatment at your expense.

NAS argues that because the Owners failed to "treat" and "secure proper care" for Off Duty, there is no coverage under the policy. Euthanasia was not a treatment for Off Duty; rather surgery was treatment and should have been attempted prior to euthanasia according to NAS. The Owners argue that euthanasia was proper and ordinary veterinary care for horses with this injury, and the only thing required under the Policy terms. They further contend that the surgical procedure was extraordinary care and not required under the "proper care" standard. NAS' argument is well taken. However, the intentional destruction provision, discussed below, is dispositive and, thus, discussion of whether the Owners treated or secured proper care for Off Duty under the terms of the Policy is superfluous.

Off Duty's intentional destruction excludes his death from coverage under the policy. The Policy provides:

12

SECTION I – COVERAGE AGREEMENT provides:

1. Mortality

    a. We will pay the applicable Amount of Insurance for death of a horse for any reason except one specifically listed under Exclusions below, occurring while this policy is in force or during the Extension of Coverage Period.

SECTION II – EXCLUSIONS …

2. The following exclusions apply to mortality coverage in this policy.
…
    b. Intentional Destruction

    This coverage does not apply to mortality caused by or resulting from intentional destruction except for humane destruction…

Thus, because Off Duty was intentionally destroyed, his death is excluded from coverage unless his destruction was "Humane Destruction." Humane Destruction is defined in the Policy as follows:

2. Humane Destruction means the intentional slaughter of a horse:

    a. when the horse suffers an injury or is afflicted with an excessively painful disease and a veterinarian appointed by our Managing Underwriter certifies in writing that the horse is incurable and in constant pain, or presents a hazard to itself or its handlers;

Thus, to qualify as an exception to the exclusion for intentional destruction – and therefore be covered - a veterinarian appointed by the managing underwriter must

13

conclude that the horse is (1) incurable and (2) in constant pain. This clause is not ambiguous, nor do the owners argue that it is ambiguous.

It is undisputed that none of the veterinarians opined at any point prior to his destruction that Off Duty was "in constant pain." Thus, no reasonable jury could find that a veterinarian certified that Off Duty could meet the requirements for Humane Destruction under the terms of the policy, and his death is excluded from coverage.

Dr. Hunt, the only veterinarian appointed by the managing underwriter, certified that prior to destruction the horse was "reasonably comfortable" and "vital parameters [were] normal." Off Duty was "not in immediate life-threatening crisis mandating an immediate destruction based on inhumane suffering." There was no indication that the horse was in constant pain. Because Dr. Hunt did not certify that the horse was in constant pain, the exception to the Intentional Destruction exclusion was not met.

The Owners created a video allegedly demonstrating Off Duty's pain prior to his destruction. Whether the horse was experiencing pain is not the relevant standard – the Policy requires that an appointed veterinarian make that determination. Thus, the video has not been considered by the Court. There can be no question that the Owners were

14

within their rights to euthanize Off Duty, but they did so with the knowledge of the terms for coverage under the Humane Destruction provision and, one must assume, were willing to euthanize Off Duty without those terms having been met. Coverage is a separate issue. Off Duty's pain is not relevant under the terms of the Policy outside of a veterinarian's confirmation that he was in constant pain.

The Owners contend that Dr. Hunt's opinion does not sufficiently address the standard under the policy and that Dr. Hunt's opinion is fatally flawed because he did not examine Off Duty. Dr. Hunt's opinion addressed Off Duty's treatment options and made it clear that Off Duty was not suffering from constant pain prior to his death. While he relied on two other veterinarians' opinions to establish his general condition and pain levels, Dr. Hunt was capable of making the pain determination in this manner. There is no evidence in the record that Off Duty's candidacy for surgery was ever in question by any of the veterinarians. The consensus among all involved was that he did not have any contraindications for surgery. The Owners do not argue that a physical examination would have revealed any new information that would have changed Dr. Hunt's written opinion in any respect, nor do they argue that he was not

15

qualified to provide an opinion on surgery and the level of pain Off Duty was experiencing.[4]

Even excluding Dr. Hunt's opinion, however, it is clear that none of the veterinarians who examined Off Duty after his injury found him to be in constant pain prior to his destruction. Thus, it is clear that the Humane Destruction provisions were not met. The Owners contend that the two written opinions prepared by Dr. Bramlage and Dr. Spirito met the qualifications for humane destruction under the Policy. However, these veterinarians were contacted by the Owners, and were acting at their behest. They were not appointed by KHI as required under the policy.

Even assuming that the opinions of Dr. Bramlage and Dr. Spirito were relevant under the Policy terms, the outcome would remain the same because neither veterinarian opined that Off Duty was in constant pain. Dr. Bramlage and Dr. Spirito's opinions address the AAEP guideline standard for humane destruction, but the AAEP guidelines differ from the criteria outlined in the Policy. Thus, whether those guidelines were met is not probative of the issue before this Court. Simply put, there is no genuine

---

[4] Moreover, Dr. Spirito, upon whose opinion the Owners' attempt to rely, also failed to personally examine Off Duty.

16

issue of material fact on this issue. None of the veterinarians consulted by either party opined that Off Duty was in constant pain and, unless that condition was met, Off Duty's intentional destruction excluded his death from coverage under the Policy.

The parties devote a significant portion of their arguments to whether the suspensory apparatus injury was incurable. All of the veterinarians involved agree that there is a greater than 50% chance that Off Duty's fetlock arthrodesis procedure would be successful and that, although he would be lame and restricted in his movement, Off Duty would be pasture sound and pain free. The parties dispute whether that means the horse is incurable under the terms of the Policy. However, the Court need not reach this argument because the failure of any veterinarian to certify that Off Duty was in constant pain is dispositive of this matter.

Accordingly, **IT IS ORDERED** that NAS' summary judgment motion [Record No. 123] is **GRANTED.**

This the 15th day of June, 2012.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge

17